IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 26, 2018 at Knoxville

## STATE OF TENNESSEE v. KRISTINA COLE and MONTEZ MULLINS

**Appeal from the Criminal Court for Shelby County**
**No. 17-01568        J. Robert Carter, Jr., Judge**

_____

## No. W2017-01980-CCA-R3-CD

_____

After a jury trial, Kristina Cole was convicted of conspiracy to possess methamphetamine with the intent to sell in a drug-free zone in count one, conspiracy to possess methamphetamine with the intent to deliver in a drug-free zone in count two, facilitation of possession of methamphetamine with the intent to sell in a drug-free zone in count three, and possession of methamphetamine with the intent to deliver in a drug-free zone in count four. The jury found Montez Mullins guilty of facilitation of conspiracy to possess methamphetamine with the intent to sell in a drug-free zone in count one and facilitation of conspiracy to possess methamphetamine with the intent to deliver in a drug-free zone in count two. Defendant Cole received a total effective sentence of thirteen and one-half years in the Tennessee Department of Correction. Defendant Montez received a total effective sentence of thirty years as a career offender. On appeal, both Defendant Cole and Defendant Montez argue that the evidence at trial was insufficient for a rational juror to have found them guilty beyond a reasonable doubt. Additionally, Defendant Cole argues that the trial court erred by allowing Detective Gaia and Investigator Brown to speculate about the meaning of text messages between Defendant Cole and Defendant Jason White. After a thorough review of the facts and applicable case law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Kortney D. Simmons, Jackson, Tennessee, for the appellant, Kristina Cole.

Charles W. Gilchrist, Jr., Memphis, Tennessee, for the appellant, Montez Mullins.

Herbert H. Slatery III, Attorney General and Reporter; Sophia Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Chris Scruggs, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual and Procedural Background

On March 30, 2017, the Shelby County Grand Jury indicted Defendant Cole on the following charges:

| Count | Offense | Offense Classification |
|---|---|---|
| One | Conspiracy to possess 300 grams or more of methamphetamine with intent to sell in a drug-free zone | Class B |
| Two | Conspiracy to possess 300 grams or more of methamphetamine with intent to deliver in a drug-free zone | Class B |
| Three | Possession of 300 grams or more of methamphetamine with intent to sell in a drug-free zone | Class A |
| Four | Possession of 300 grams or more of methamphetamine with intent to deliver in a drug-free zone | Class A |

On the same day, the Shelby County Grand Jury indicted Defendant Montez on the following charges:

| Count | Offense | Offense Classification |
|---|---|---|
| One | Conspiracy to possess 300 grams or more of methamphetamine with intent to sell in a drug-free zone | Class B |
| Two | Conspiracy to possess 300 grams or more of methamphetamine with intent to deliver in a drug-free zone | Class B |

At trial, Detective Mark Gaia testified that he worked for the Bartlett Police Department ("BPD"). Around February 2, 2016, Detective Gaia received a phone call from a detective in Visalia, California, regarding a package that had been shipped from California to an address in Bartlett that contained methamphetamine. The package was addressed to "Bailey Green" and listed 2552 Linwood as the address.[1] After the BPD

---

[1] Detective Gaia determined that there was not a valid address of 2552 Linwood in Shelby County. He learned that the correct address was 2552 Jenwood.

received the package from the California detective, officers weighed the package and tested the contents for illegal drugs. Detective Gaia testified that the package contained a bag of children's clothing and one pound of methamphetamine. He explained that a pound of methamphetamine would be worth $12,000 to $15,000.

Detective Gaia obtained a warrant to search for narcotics, and Detective Jeffrey Swindol conducted a controlled delivery of the package to Defendant Cole's residence at 2552 Jenwood. After Defendant Cole accepted the package, Detective Gaia knocked on the door of her residence, and Defendant Cole let him inside. Once inside, Detective Gaia observed the package inside the house. Defendant Cole gave him permission to search the residence. During the search, Detective Robert Christian found a photograph on the nightstand in Defendant Cole's bedroom that depicted a man wearing a prison uniform. When Detective Gaia asked Defendant Cole about the photograph, she stated that it was her ex-boyfriend, "Timothy Smith," whose birthday was March 11. Detective Gaia confirmed that the individual in the photograph was Jason White based on "numerous handwritten letters that were addressed to Kristina Cole from [Jason White] at the Riverbend Maximum Institution near Nashville."

Detective Gaia collected three cell phones from Defendant Cole: a Verizon HTC phone, a Samsung phone, and an LG phone. He also found a laptop computer. He observed that Defendant Cole had recently tracked a package on the FedEx website from the search history of the computer. The tracking number of the package that Defendant Cole tracked electronically matched the number of the package that the BPD delivered to Defendant Cole's residence. Defendant Cole denied knowing anyone named Bailey or knowing the contents of the package. Detective Gaia identified evidence of several forms of communication between Defendant Cole and Defendant White, including a handwritten letter from White to Cole. Detective Gaia also found a receipt for a money order to "Jason White," which listed his inmate booking number, and a receipt for a purchase by Defendant Cole to Defendant White through Union Supply Direct, Inmate Direct Sales. Detective Gaia observed several PayPal and MoneyPak cards in Defendant Cole's residence.

While Detective Gaia was discussing the contents of the computer with Defendant Cole, the LG cell phone continuously rang. The caller was listed in Defendant Cole's phone as "Line Boo Other[.]" When Detective Gaia picked up the phone and hit the answer button, Defendant Cole stated that she wanted an attorney. After Detective Gaia placed Defendant Cole under arrest, Dustin White[2] pulled into the driveway of Defendant

---

[2] Detective Gaia refers to this individual as "Dustin Van White." However, this individual is referred to as "Dustin White" in the remainder of the transcripts. For purposes of clarity, we will refer to him as Mr. White.

Cole's residence. As he spoke with Mr. White, Detective Gaia noticed that the same phone number that called Defendant Cole's phone was also continuously calling Mr. White's phone. Detective Gaia noted that Mr. White was the brother of Defendant White and that the phone number that called Mr. White's phone was listed as "J." Detective Gaia stated that Defendant Cole's residence was located "in very close proximity to a school." Detective Gaia identified a Google Earth picture that showed that Defendant Cole's residence was approximately 200.62 feet away from Raleigh-Bartlett Meadows Elementary School.[3]

Detective Gaia testified that he listened to the recordings of Defendant Cole's outgoing calls while she was incarcerated.[4] During one call, Detective Gaia identified the voice of Defendant Cole's daughter, Desiree Cole, who connected Defendant Cole with a third party, Kimberly White, Defendant White's mother. Ms. White then connected the call to Defendant White's phone via speaker phone. Detective Gaia identified nineteen phone calls where Defendant White was a part of the conversation with Defendant Cole.

On Defendant Cole's HTC cell phone, Detective Gaia observed that Defendant Cole sent a photograph of herself to (731) 693-6346. Defendant Cole also received a photograph of Defendant White from (901) 573-4218. The photograph message was signed "Da Junk Yard." Detective Gaia noted that the photograph of Defendant White appeared to have been taken in a jail cell. Detective Gaia also examined the contact list and text messages on Defendant Cole's HTC cell phone. He observed that the contact number for "Jason White" and "Boo" were the same—(731) 217-2745. He also noted that the contact number for "New Boobear" was (731) 694-7388.

When Detective Gaia examined Defendant Cole's Samsung cell phone, he observed text message exchanges with (731) 694-9127. This phone number used a signature of "COUNTRY CRAZY[.]"[5] Defendant Cole texted the following message to this number: "Hey baby. This is my other number. Lock me in. Love I [sic] baby . . .[]" Throughout Defendant Cole's numerous text message exchanges with this phone number, she frequently referred to the recipient as "BooBear." Defendant Cole also referred to the recipient of messages to (731) 499-3517 as "BooBear." This phone number used

---

[3] Sergeant Terrence Riley also testified that Defendant Cole's residence at 2552 Jenwood was located within 1,000 feet of Raleigh Bartlett Meadows Elementary School.

[4] Detective Michael Harber of the Shelby County Sheriff's Office explained that inmates used personal identification numbers when placing a call at the jail. Detective Harber identified a recording of phone calls that Defendant Cole made while she was incarcerated, and a CD containing the phone calls was admitted as an exhibit at trial. However, the CD of Defendant Cole's jail phone calls included in the appellate record was not functional.

[5] Many phones have the ability to automatically add a signature of the user's choosing to the end of every text message.

"L.L.K.N. J.Y.D." as its signature, and Defendant Cole had saved this number in her contact list as "New BooBear." On January 28, 2016, Defendant Cole sent the following message to "New BooBear": "$125 - 890 884 6154[.]" Detective Gaia stated that Defendant Cole was informing Defendant White that she loaded $125 into account number 890-884-6154. Detective Gaia also discovered contacts in Defendant Cole's Samsung cell phone named "BooBear Other Line[,]" connected to (731) 394-1929 and "BooBear Second[,]" connected to (615) 917-3749.

Detective Gaia also examined Defendant Cole's LG cell phone and found a photograph of Defendant White that was sent from (731) 693-2611. The sender of the photograph used the following signature: "Da Junk Yard." Defendant Cole sent messages to this phone number and referred to the recipient as "BooBear." Defendant Cole also exchanged text messages with (731) 443-6670, and again, she referred to the recipient of her messages as "BooBear." In May 2015, Defendant Cole texted (615) 564-0303 on her LG cell phone and referred to the recipient as "BooBear." The recipient used the following signatures: "$SAME N***A SINCE DAY1$" or "$Loyalty Bring Royalty$[.]" In July 2015, Defendant Cole began exchanging text messages with (731) 694-9127, and she referred to the recipient as "BooBear." The recipient used the signature of "COUNTRY CRAZY[.]" Starting in September 2015, Defendant Cole began exchanging text messages with an unidentified contact at (901) 661-9076.[6] Defendant Cole and the recipient discussed loading various amounts of money on pre-paid credit/debit cards. For example, Defendant Cole received the following message from "Eastwood": "$40.#7287013535. $500.#723-035-8681[.]" Defendant Cole also exchanged text messages with contacts identified as "New BooBear" connected with (731) 499-3517 and "Line Boo Other" connected with (615) 917-3749. Defendant Cole sent the following text messages to "Line Boo Other" on January 27, 2016: "Sender: Kristina Cole, Memphis TN Control #864-588-3690, $100" and "$75 - 756 663 9348 $30 - 748 829 1871[.]" On February 3, 2016, Defendant Cole sent the following text messages to "Line Boo Other": "Package arrived"; "They put the wrong street name. Lucky they knew what it was suppose[d] to be"; and "What do you want me to do with it?"[7]

On cross-examination, Detective Gaia clarified that the managers at the California FedEx facility opened the package because they suspected that it contained contraband. A detective in California then contacted the SCSO regarding the package. Detective Gaia

---

[6] This phone number was later identified as "Eastwood" in Defendant Cole's contact list in her LG phone.

[7] On cross-examination, Detective Gaia stated that he sent this final text message to "Line Boo Other." He explained that he sent the text message because he was attempting to arrange for the owner of the package to pick it up.

agreed that the text message exchanges between Defendant Cole and Co-defendant White were not illegal on their face. He also agreed that transferring money into a PayPal account or using a prepaid credit/debit card was not illegal. Detective Gaia agreed that Defendant Cole had no criminal record prior to the current offenses. He stated that Defendant White used at least ten different phone numbers to communicate with Defendant Cole. Detective Gaia could not confirm that Defendant White had exclusive control of the phone numbers.

Special Agent Peter Hall testified that he worked for the TBI as a forensic chemist. After the trial court declared Special Agent Hall to be an expert, he stated that the package delivered to Defendant Cole's residence contained 441.17 grams of methamphetamine, a Schedule II controlled substance.

Detective Christian testified that he worked in the Investigative Services Narcotics Unit of the BPD. On February 3, 2016, Detective Christian assisted Detective Gaia with executing the search warrant on Defendant Cole's residence at 2552 Jenwood. Detective Christian found a photograph of Defendant White on Defendant Cole's nightstand. On February 22, 2017, Detective Christian interviewed Defendant Mullins. Detective Christian stated that he did not believe Defendant Mullins was completely truthful during the interview because Defendant Mullins said "honestly" and "I swear to God" frequently.

During his interview with Detective Christian, Defendant Mullins stated that, at the end of January 2016, he was incarcerated at the "Northeast penitentiary" when another inmate, "Angel," approached him and offered to pay him $600 if Defendant Mullins provided him with a mailing address in Memphis. Angel informed Defendant Mullins that the package would contain "ice," or crystal methamphetamine. Defendant Mullins contacted Defendant Cole and asked if he could send a package with a gift of jewelry for his mother to her address. Defendant Cole agreed, and Defendant Mullins gave her address to Angel. Angel then gave Defendant Mullins $300 through PayPal and promised to give him an additional $300 after the package was delivered. Angel later provided Defendant Mullins with a tracking number for the package, which Defendant Mullins gave to Defendant Cole. A few days later, Defendant Mullins received a text message informing him that the package arrived, despite the fact that the package listed the wrong address. Defendant Mullins informed Angel that the package arrived and attempted to call Defendant Cole. After he was unable to reach Defendant Cole, Defendant Mullins called Defendant Cole's "husband," Defendant White. Defendant Mullins later learned that Defendant Cole had been arrested and charged for her role in the current offenses.

- 6 -

Defendant Mullins asserted that Defendant Cole was unaware that the package contained methamphetamine. Defendant Mullins explained that he met Defendant Cole through Defendant White. Defendant Mullins met Defendant White while they were incarcerated in Morgan County in 2012. He also stated that Defendant Cole called Defendant Mullins "Boo Bear." He said that he did not have a romantic relationship with Defendant Cole.

Investigator Andrew Brown testified that he worked for the Tennessee Department of Correction as an investigator in the Office of Investigation and Complaints. Investigator Brown met Defendant White while Defendant White was incarcerated at the Riverbend Maximum Security Institution. On February 3, 2016, Investigator Brown received a phone call from Detective Gaia about Defendant White. Based on his conversation with Detective Gaia, Investigator Brown and some other employees went to Defendant White's cell and observed Defendant White flushing a cell phone down his toilet. Investigator Brown confiscated a cell phone charger but was unable to retrieve the cell phone. Investigator Brown stated that one of the signatures that Defendant White used to communicate with Defendant Cole, LLKN JYD, meant "Long Live King Neal Junk Yard Dog[.]" "Long Live King Neal" referred to Neal Wallace, the founder of the Traveling Vice Lords gang. "Junk Yard Dog" referred to a faction of the Traveling Vice Lords that was organized by Charles Thompson, also known as "Country." Investigator Brown testified that there was no legitimate reason for an inmate to need a PayPal or Green Dot account. He explained that inmates could receive financial help from friends and family members through JPay, but inmates did not need a non-authorized cell phone to receive funds through JPay and non-inmates could send money to an inmate through JPay with a computer or smart phone. In Investigator Brown's experience, inmates used PayPal or Green Dot accounts to purchase contraband items such as tobacco products, narcotics, cell phones, or homemade weapons. He acknowledged that he did not know what the specific transactions noted on Defendant Cole's phone were for.

Defendant Cole, Defendant White, and Defendant Mullins decided to not testify. The jury found Defendant Cole guilty of conspiracy to possess methamphetamine with the intent to sell in a drug-free zone in count one, conspiracy to possess methamphetamine with the intent to deliver in a drug-free zone in count two, facilitation of possession of methamphetamine with the intent to sell in a drug-free zone in count three, and possession of methamphetamine with the intent to deliver in a drug-free zone in count four. The jury found Defendant Mullins guilty of facilitation of conspiracy to possess methamphetamine with the intent to sell in a drug-free zone in count one and

facilitation of conspiracy to possess methamphetamine with the intent to deliver in a drug-free zone in count two.[8]

The trial court sentenced Defendant Mullins to thirty years as a career offender for his convictions in count one and two. The trial court ordered these sentences to be served consecutively to his sentence in a previous case and merged Defendant Mullins' convictions in counts one and two.

The trial court sentenced Defendant Cole to thirteen and one-half years with release eligibility after service of 100% of the sentence in counts one and two. Additionally, the trial court merged the convictions in counts one and two. The trial court also merged counts three and four and sentenced Defendant Cole to thirteen and one-half years with release eligibility after service of 100% of the sentence in those counts. The trial court ordered Defendant Cole's sentences in counts one and two to be served concurrently to her sentences in counts three and four, for a total effective sentence of thirteen and one-half years in the Tennessee Department of Correction.

Defendant Cole and Defendant Mullins now timely appeal their convictions.

## II. Analysis

On appeal, Defendant Mullins argues that the evidence introduced at trial was insufficient for a rational juror to have found him guilty of facilitation of conspiracy to possess methamphetamine with the intent to sell or deliver beyond a reasonable doubt. Defendant Cole argues that the evidence introduced at trial was insufficient for a rational juror to have found her guilty of conspiracy to possess methamphetamine with the intent to sell or deliver and possession of methamphetamine with the intent to sell or deliver beyond a reasonable doubt. Defendant Cole also argues that the trial court erred by allowing Detective Gaia and Investigator Brown to testify about speculative, irrelevant testimony.

### *Sufficiency of the evidence*

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

---

[8] The jury found Defendant White guilty of conspiracy to possess methamphetamine with the intent to sell in a drug-free zone in count one and conspiracy to possess methamphetamine with the intent to deliver in a drug-free zone in count two. Defendant White filed a notice of appeal, and his appeal is currently pending with this court.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

*Defendant Cole*

Defendant Cole argues that the State failed to establish her guilt beyond a reasonable doubt because the State did not present any direct evidence that Defendant Cole knew what was in the package or the plan for the package upon arrival. The State notes that it can rely on circumstantial evidence alone for conviction and that "[t]he jury heard Defendant Mullins's statement and Defendant Cole's statement about her knowledge of the contents of the package and chose to reject them as the jury is entitled to do."

Conspiracy is committed when "two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." Tenn. Code Ann. § 39-12-103(a) (2016). "No person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." Tenn. Code Ann. § 39-12-103(d) (2016). "Conspiracy is a continuing course of conduct that terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired." Tenn. Code Ann. § 39-12-103(e)(1) (2016). "The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the crime, and measures, other than silence, for concealing the crime or obstructing justice in relation to it." *Id.* "While the essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act, . . . . the agreement need not be formal or

- 9 -

expressed, and it may be proven by circumstantial evidence." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998) (internal citation omitted).

Methamphetamine is a Schedule II controlled substance. Tenn. Code Ann. § 39-17-408(d)(2) (2016). It is a criminal offense for a person to knowingly "[p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4) (2016).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."

Tenn. Code Ann. § 39-11-302(b) (2016). "Proof that a possession is knowing will usually depend on inference and circumstantial evidence." *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995). "The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987).

With regard to a determination of intent to sell or deliver, proof of intent usually consists of circumstantial evidence and the inferences that can be reasonably drawn from that evidence. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983) (observing that a jury may derive a defendant's intent from both direct and circumstantial evidence). The jury may infer "from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419 (2016). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. §39-11-403(a) (2016).

When the evidence is viewed in the light most favorable to the State, we conclude that the evidence was sufficient for a rational juror to have convicted Defendant Cole of conspiracy to possess methamphetamine with the intent to sell or deliver and possession of methamphetamine with the intent to sell or deliver in a drug-free zone. Detective Gaia testified that he learned that a package that contained a controlled substance was scheduled to be delivered to "Bailey Green" at Defendant Cole's address. Detective Gaia opened the package and observed that it contained a pound of methamphetamine.

- 10 -

Defendant Cole accepted the package containing methamphetamine during the controlled delivery. In Defendant Cole's residence, Detective Gaia and other officers found a photograph of Defendant White, letters from Defendant White to Defendant Cole, and prepaid credit/debit cards. Detective Gaia also found a computer, and Defendant Cole had recently tracked the package that contained methamphetamine on the FedEx website. Detective Gaia testified that Defendant Cole's residence was located in a drug-free zone.

Additionally, Detective Gaia recovered three cell phones. A phone number labeled as "Line Boo Other" called Defendant Cole's LG phone continuously during Detective Gaia's search of Defendant Cole's residence. After Mr. White arrived at the residence, Detective Gaia observed that the same phone number was calling Mr. White's phone but was labeled at "J" in Mr. White's phone. On Defendant Cole's three phones, Detective Gaia found several photographs of Defendant White in a prison cell that had been sent to Defendant Cole from various phone numbers. These phone numbers were sometimes labeled as "New BooBear" or "Line Boo Other" in Defendant Cole's contact list. In text message exchanges, Defendant Cole continually referred to the recipient of her messages at the phone numbers as "BooBear." These phone numbers used signatures such as "Da Junk Yard[,]" "COUNTRY CRAZY[,]" or "L.L.K.N. J.Y.D." The jury could have inferred that Defendant White was communicating with Defendant Cole through these text message exchanges. Additionally, several text messages between Defendant Cole and Defendant White's phone numbers referenced transferring money into accounts or purchasing prepaid credit/debit cards.

Investigator Brown testified that he observed Defendant White flushing a cell phone and charger down the toilet in his cell at Riverbend Maximum Security Prison on the same day that Detective Gaia observed "Line Boo Other" calling Defendant Cole's cell phone. Investigator Brown also testified that inmates frequently transferred money into prepaid credit/debit card accounts through PayPal, Kroger, or Green Dot cards in order to purchase contraband such as "[t]obacco products, narcotics, cell phones, [and] weapons."

The jury could have inferred that two or more people—including Defendant Cole, Defendant Mullins, Defendant White, and Angel—acted for the purpose of facilitating the possession of methamphetamine with the intent to sell or deliver and agreed that Defendant Cole would engage in conduct that constituted possession of methamphetamine with the intent to sell or deliver. Defendant Mullins admitted to Detective Christian that he asked Defendant Cole if he could send a package to her house that he knew contained methamphetamine. Defendant Cole tracked the package on her computer through the FedEx website and accepted the package during the controlled delivery. Shortly after delivery, she texted Defendant White to inform him that the package had been delivered. Agreeing to accept the package and accepting the package

were overt acts in pursuance of the conspiracy.  *See* Tenn. Code Ann. § 39-12-103(d) (2016).

Although Defendant Cole argues that the State failed to establish that she knowingly possessed the methamphetamine, it was jury's prerogative to reject Defendant Mullins' statement that he told Defendant Cole that the package contained jewelry and that she was unaware of the package's actual contents.  Based on Defendant Cole's numerous text message exchanges with Defendant Cole and "Eastwood" about transferring money into accounts, which Investigator Brown testified was frequently used to purchase contraband such as illegal drugs, the jury could have inferred that Defendant Cole was aware that the package that Defendant Mullins arranged to send to her residence contained an illegal substance.  *See* Tenn. Code Ann. § 39-11-302(b) (2016) (a person acts knowingly with respect to the circumstances surrounding the conduct "when the person is aware . . . that the circumstances exist").  Additionally, the jury could have inferred that Defendant Cole knowingly texted Defendant White that the package that contained methamphetamine arrived when she texted "Package arrived" and "They put the wrong street name.  Lucky they knew what it was suppose[d] to be[.]"  Based on the fact that the package contained one pound of methamphetamine worth between $12,000 and $15,000, the jury could have inferred that Defendant Cole and her conspirators intended to sell or deliver the methamphetamine to another party.  *See* Tenn. Code Ann. § 39-17-419 (2016).  Defendant Cole is not entitled to relief on this ground.

*Defendant Mullins*

Defendant Mullins argues that the evidence was insufficient to support his conviction of facilitation of conspiracy to possess methamphetamine with the intent to sell or deliver in a drug-free zone because he testified that neither Defendant Cole nor Defendant White knew that the package delivered to Defendant Cole's residence contained methamphetamine.  The State contends that "Defendant Mullins furnished substantial assistance to the conspiracy by providing Angel with Defendant Cole's address, accepting money for the address, providing Defendant Cole with the tracking information, and informing Angel when Defendant Cole accepted the package."

We have previously set out the law on conspiracy, facilitation, and possession in this opinion.  When the evidence is viewed in the light most favorable to the State, we conclude that the evidence was sufficient for a rational juror to have found Defendant Mullins guilty of facilitation of conspiracy to possess methamphetamine with the intent to sell or deliver in a drug-free zone.  Detective Christian testified that he interviewed Defendant Mullins about his involvement in the offenses at issue.  During the interview, Defendant Mullins stated that a fellow inmate named Angel had offered to pay him $600 if Defendant Mullins gave him an address in Memphis to which Angel could send a

- 12 -

package of methamphetamine. Defendant Mullins asserted that he asked Defendant Cole if he could send a package of jewelry for his mother to her address and claimed that Defendant Cole did not know that the package actually contained methamphetamine. He also claimed that Defendant Cole referred to him as "Boo Bear." However, it was within the purview of the jury to discredit Defendant Mullins' statement to Detective Christian. It was also the jury's prerogative to infer that Defendant Cole was communicating with Defendant White, not Defendant Mullins, in the numerous text message exchanges between Defendant Cole and "BooBear," "New BooBear," and "Line Boo Other[.]" Based on Defendant Mullins' admission to Detective Christian that he provided a mailing address in Memphis to Angel in exchange for $600, we conclude that Defendant Mullins "knowingly furnishe[d] substantial assistance in the commission" of the conspiracy to possess methamphetamine with the intent to sell or deliver in a drug-free zone. *See id.* Defendant Mullins is not entitled to relief on this ground.

### *Admission of testimony on text messages*

Defendant Cole argues that the trial court should not have allowed Detective Gaia and Investigator Brown to testify regarding the meaning of some text message exchanges between Defendant Cole and Defendant White, which referenced dollar amounts and account numbers. Defendant Cole asserts that Detective Gaia and Investigator Brown did not have sufficient personal knowledge to support their testimony and that the testimony was irrelevant. The State contends that the trial court properly admitted Detective Gaia and Investigator Brown's testimony.

In order for evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." Tenn. R. Evid. 602. A witness has personal knowledge of facts when the witness "perceived the facts through one or more of the five senses." *State v. Boling*, 840 S.W.2d 944, 949 (Tenn. Crim. App. 1992). A lay witness may give testimony in the form of opinions or inferences if the testimony is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). We review a trial court's ruling regarding the admissibility of evidence for an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

*Detective Gaia's testimony*

The following exchange occurred during Detective Gaia's direct testimony:

[THE STATE:] Now if you could look at 460, 465. Well, let me jump back a little bit. Look in the 270 range and tell the Court or tell the jury what you see happening here. These conversations with the unidentified person.

[DETECTIVE GAIA:] All right.

[THE STATE:] You don't have to go through, just describe what you see in the text messages and what your interpretation and their meaning is.

[DETECTIVE GAIA:] They're texts concerning account numbers and the amounts of money being put on them. Text message 277 has forty dollars and an account number.

[DEFENSE COUNSEL]: I'm going to object, your Honor.

THE [TRIAL] COURT: Based on?

[DEFENSE COUNSEL]: Your Honor, it's speculation as far as what's going on. It simply says a dollar amount and then there's a number that follows over it. He . . . can't say definitely that it is talking about account being loaded or anything like that. He can just simply . . . read the text message and what it is but he can't interpret that because he doesn't have the prior knowledge.

THE [TRIAL] COURT: Well, I think he can say what it means to him. But again, ladies and gentlemen, it's like slang or anything else, I can have someone tell you what they think it means, but ultimately it will be for you, the jury, to determine, if you need to make a determination what that means.

So I do understand where you're coming from but I think the officer in his limited experience is able to tell what he thinks that's referring to based on his experience. But again, it will be for you, members of the jury, to decide if that's what it means or not.

- 14 -

[THE STATE:] I'm not going to go very deep into this, Judge.

THE [TRIAL] COURT: I thought the question was more going to be relevance and I was more leaning in that direction. I'm not sure but I'm, we'll give you a little room to try to tie all this up.

[THE STATE:] If you would, Detective, look the number 278 and we'll pass this. Read the text. Just read the text?

[DETECTIVE GAIA:] Text 278 says: I've got the forty loaded but for some reason I can't load the five hundred. It's good because I called and checked -- and checked but I keep getting an error code every time I try and load it.

[DEFENSE COUNSEL]: Your Honor, I'm going to object to the relevance of that because, I mean.

THE [TRIAL] COURT: It will be for the, again, the jury. I don't see what it is right now but in terms of this, we've been talking about it since day one, these are conspiracy charges and so the conversation, if the jury accredits that to being between two of the defendants, you know, I will let them place what emphasis on it they will.

On cross-examination, Detective Gaia agreed that transferring money into a PayPal account or using a gift card was not illegal.

The State argues that, after Defendant Cole objected, "Detective Gaia provided no further commentary or 'interpretation' regarding [Defendant Cole's] text messages, and the trial court properly instructed the jury of its duty to determine the weight of Detective Gaia's testimony." The State also notes that "Detective Gaia acknowledged on cross-examination that, even if the text messages referenced account numbers, there was nothing inherently illegal about sending an account number with a dollar amount" and that "there was no direct evidence connecting this information to the methamphetamine in the package delivered to Defendant Cole's home."

We conclude that the trial court properly admitted Detective Gaia's testimony. Here, defense counsel objected to Detective Gaia's testimony on the basis of lack of personal knowledge and relevance. Detective Gaia had personal knowledge of the text messages because he seized Defendant Cole's phones and examined the text messages on the phones. *See* Tenn. R. Evid. 602. Additionally, we conclude that Detective Gaia's

testimony relating to the text messages was relevant because the evidence had a tendency to make the existence of a financial relationship between Defendant Cole and Defendant White more probable. *See* Tenn. R. Evid. 401. Finally, we note that the trial court instructed the jury that it was the jury's task to determine whether the jury agreed with Detective Gaia's reading of the text messages. We hold that the trial court did not err in admitting Detective Gaia's testimony that discussed the text message exchange between Defendant Cole and Defendant White.

*Investigator Brown's testimony*

The following exchange occurred during Investigator Brown's direct testimony:

[THE STATE:] Have you ever had a chance to review transactions through these alternative meetings, these, you know, electronic phones that never really touch the ground, they're just kind of out there in a cloud?

[INVESTIGATOR BROWN:] Yes. On occasion I have been able to follow PayPal transactions, Green Dot transactions.

[THE STATE:] What do inmates use PayPal accounts, Kroger accounts, Walgreens accounts, what do they use those for?

[DEFENSE COUNSEL]: Judge, I object. That's outside the scope of this trial. It's not relevant to this trial.

THE COURT: Well I think it's, with all due respect, I think it is.

[DEFENSE COUNSEL]: And also calls for an opinion and speculation.

THE COURT: And I think he's given a basis for his knowledge on that subject. And again, it will be up to the jury what they accredit or don't. So I'm going to allow it. I think this is -- he'll be allowed to answer it if he knows.

[THE STATE:] In those text messages that involve monetary transactions -- let me back up. What legitimate transactions, what legitimate sources of income can inmates have access to while they're in custody?

[INVESTIGATOR BROWN:] Family members of inmates have access to what they call JPay. And what that does is you put money on an inmate[']s account, it goes onto their, their inmate books. They can buy commissary, time on the phone, toiletries or hygiene, things like that.

[THE STATE:] Time on a monitored . . . prison phone?

[INVESTIGATOR BROWN:] Yes. Yes.

[THE STATE:] And just so we're clear, I'm sure everybody knows, but are personal cell phones permitted to be possessed by inmates?

[INVESTIGATOR BROWN:] No.

[THE STATE:] And to access th[ese] JPay accounts by outside free world person, [doe]s it require the inmate to have a cell phone?

[INVESTIGATOR BROWN:] No.

[THE STATE:] Does it require even a person on the outside to have a cell phone?

[INVESTIGATOR BROWN:] No.

[THE STATE:]You use a computer?

[INVESTIGATOR BROWN:] Yes.

[THE STATE:] Does it require direct contact between the inmate and the free world person?

[INVESTIGATOR BROWN:] Not on an unmonitored device, no.

[THE STATE:] Well on any device?

[INVESTIGATOR BROWN:] No.

. . . .

[THE STATE:] And then going through those transactions, and for the record, I believe item -- what was the exhibit number on the back of that?

[INVESTIGATOR BROWN:] 31.

[THE STATE:] 31, that being the LG phone, you didn't go through all three phones, did you?

[INVESTIGATOR BROWN:] No, sir.

[THE STATE:] Just that one?

[INVESTIGATOR BROWN:] Just this one.

[THE STATE:]And you looked, you saw -- did you see transactions that appear to be involving monetary transfers?

[INVESTIGATOR BROWN:] I saw several transactions ranging from twenty-five dollars, I believe, all the way up to maybe five hundred. There was a mention of a five hundred dollar transaction in there as well.

[THE STATE:] All right. In your experience and investigation pre-prior, what are those transactions for? Or what could they be for?

[DEFENSE COUNSEL]: Again, judge, speculation.

THE COURT: I'm going to let him answer, if he knows, they could be for in your experience and give the reason. But as to what they were for, unless you have personal knowledge, I am going to sustain the objection to that question unless you have some way of knowing exactly what this is for. But what your experience tells you the type of things, let me hear the answer and I'm say it may or may not have anything to do with it.

So because I'm sitting here going -- somethings it could be very relevant to this trial and other things it, while it may be interesting, it may not have any bearing on this. What --

[INVESTIGATOR BROWN]: In my experience, your Honor, different amounts or different denominations transactions have meant different things.

- 18 -

PayPal, Kroger cards, Green Dots, those numbers are used for, and again in my experience, they've been used for the purchase of contraband[]. Tobacco products, narcotics, cell phones, even weapons, and by weapons I mean homemade knives. These specific transactions I don't exactly what they were for.

. . . .

[INVESTIGATOR BROWN:] But in my experience the twenty-five, the fifty, the hundred, those are usually tobacco, marijuana and narcotics.

[THE STATE]: Okay. If the Court's finished.

THE COURT: I am. And, ladies and gentlemen, I think what I allowed the witness to tell you what his experience has been in the past as I think he very clearly said he doesn't have personal knowledge of these particular transactions and, you know, I think we'll go from there.

[THE STATE:] Suffice it to say, is there an underground market for the transactions of contraband in the prison?

[INVESTIGATOR BROWN:] Most definitely.

[THE STATE:] And in your review of these transactions that involve monetary amounts and what appear to be some sort of transaction number or account numbers for any of them involving a JPay account?

[INVESTIGATOR BROWN:] There was one mention of putting money on JPay. When the individual came back with I can only put so much on an account per day, the individual on the other line said just get me a PayPal. So there was one mention of a potential, potentially legitimate transaction but then it went to who was the end of a transaction when it went to the PayPal. So I have to say no, there w[ere] no legitimate monetary transactions from what I've read in this cell phone report.

We agree with the State that the trial court did not err in admitting Investigator Brown's limited testimony. Here, defense counsel objected to Investigator Brown's testimony on the basis of lack of personal knowledge and relevance. Investigator Brown had personal knowledge of the content of the text messages on Defendant Cole's LG phone because he examined the report prepared by Detective Gaia that listed the text

- 19 -

messages, the sender, and the recipient. *See* Tenn. R. Evid. 602. Further, Investigator Brown had personal knowledge of the fact that inmates frequently use prepaid debit/credit cards for illegal transactions while incarcerated based on his experience working as a corrections officer. Investigator Brown stated that, in his experience, PayPal, Kroger, and Green Dot cards are "used for the purchase of contraband" such as "[t]obacco products, narcotics, cell phones, even weapons[.]" Investigator Brown specifically acknowledged that he did not know what the transactions listed on Defendant Cole's phone were for, thereby limiting his testimony to the extent of his personal knowledge.

Additionally, we conclude that Investigator Brown's testimony relating to the text messages was relevant because the evidence had a tendency to make the existence of a financial relationship between Defendant Cole and Defendant White more probable. *See* Tenn. R. Evid. 401. We also conclude that Investigator Brown properly offered an opinion on the evidence as a lay witness. Investigator Brown's testimony that inmates frequently use prepaid debit/credit cards for illegal transactions was an opinion that was "rationally based" on his perception as a corrections officer and was "helpful to a clear understanding" of his testimony as well as the jury's determination of whether Defendant Cole and Defendant White had conspired to possess methamphetamine. *See* Tenn. R. Evid. 701(a). The trial court properly admitted Investigator Brown's testimony, and Defendant Cole is not entitled to relief on this ground.

### III. Conclusion

We conclude that the evidence was sufficient for a rational juror to have found Defendant Cole guilty of conspiracy to possess methamphetamine with the intent to sell in a drug-free zone in count one, conspiracy to possess methamphetamine with the intent to deliver in a drug-free zone in count two, facilitation of possession of methamphetamine with the intent to sell in a drug-free zone in count three, and possession of methamphetamine with the intent to deliver in a drug-free zone in count four. Additionally, we conclude that the evidence was sufficient for a rational juror to have found Defendant Mullins guilty of facilitation of conspiracy to possess methamphetamine with the intent to sell in a drug-free zone in count one and facilitation of conspiracy to possess methamphetamine with the intent to deliver in a drug-free zone in count two beyond a reasonable doubt. Lastly, we conclude that the trial court did not err in admitting Detective Gaia's and Investigator Brown's testimony about Defendant Cole's text message exchange with Defendant White. Therefore, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE